Two cases to be submitted today on oral argument, beginning with Garcia v. Madsen. Mr. Fleming. Mr. Fleming. Good morning, and may it please the court. It might be helpful at the outset for me to state what issues are not an issue here, and which ones are, and let me address the ones that are. The ones that are not an issue, in my belief, are standing. First of all, Mr. Garcia is a class member. He's not a named party. He has an interest in the settlement fund. He's timely objected, and there's nothing in the final judgment challenging Mr. Garcia's standing. He has standing to object under Rule 23E5A. So that, I don't believe, is in dispute. The second thing that's not in dispute, or that we don't bring in dispute, is with regard to the opt-outs. During the course of the litigation, I sent a letter to all class members with regard to a criticism of the settlement. That letter, I believe, still was accurate. The court did not, the lower court did not believe it was accurate, and voided over 400 opt-outs. We don't bring an issue in this appeal with regard to that. What is an issue— But why did your client opt out and then opt back in, knowing that they didn't like the settlement? Mr. Garcia opted out at first, but then he opted back in when he found out some of the things about the settlement. But he wanted to object to try to improve the settlement. That's what his position is, Your Honor. Okay, but I just don't understand that. If he doesn't like the settlement, why does he opt back in? Why doesn't he just file his own lawsuit? Because he believes that he could get some benefit from the settlement, but he wants to improve the settlement by objecting to it, Your Honor. Some aspects of the settlement. And that doesn't undercut his position? I'm sorry, Your Honor. That does not undercut his position? It may undercut his position some, Your Honor, but he still has the right to object to the settlement after due consideration with regard to it. The two issues that are in dispute, in my opinion, and that I'll be addressing are, first of all, the lower court abused its discretion under the 1997 case of Amkin v. Windsor, in that the homeowners that will receive future damages are not adequately represented. And they are not adequately represented in this class at all. No subclass, no protection, no anything with regard to protecting them as far as future losses are concerned. But aren't the dry and the wet class members, aren't they to be reimbursed at the same rate? I'm sorry, Your Honor. Aren't the dry class members and the wet class members to be reimbursed at the same rate? I'm still having a problem. I'm sorry. Are the dry and the wet class members to be reimbursed at the same rate? No, as a matter of fact, because of the claims deadline, the dry class members, if you want to call them that, the ones that haven't suffered damage yet, probably won't be compensated at all because there's a claims deadline of May 2025. And it's highly likely that their damages in a lot of cases will not occur until after that date. They'll be cut off. They won't have any compensation at all. But isn't there evidence that the claims would have occurred during that time? They're not going to be some future sudden crack in the pipe? Well, they have to have three qualifying leaks, Your Honor. And so if they have the first leak and not the second and the third until after 2025, they don't get any compensation at all with regard to re-plumb costs. Okay. What about the warranty still being enforced? If they have a warranty that they can continue to enforce it after 2025? Your Honor, the warranty, the NBCO 25-year warranty, is a warranty that even NBCO takes the position as it has to do with a manufacturing defect. This case is not about manufacturing defect. It's a design defect case. And so it doesn't even cover consequential damages. So basically the warranty that they've talked about is totally, completely inadequate. Now the second issue that I want to talk about is the proposed settlement is unreasonable to the class. It is under the reed factors. The range of recovery and the certainty of the damages are such that this class is inadequate. Let me start with Amkin. This case involves failures in the futures. The claim deadline of May 25, 2025, will cut off those claims in the future. These are pipes that are installed behind the walls and in the attics. They fail from the inside out. If you'll take a look at the exhibit that we furnished to the court at the beginning of this, you'll see in that exhibit that there are cracks in the inside of the pipe. If you take a look at that, you'll see that this is a pipe that Cynthia Smith testified was five years old inside a wall. It's longitudinally sectioned and it shows the little cracks that are occurring as a result of chlorine that are in the water that you and I drink. And that chlorine reacts and takes away the stabilizer in the inside of the pipe and starts those little cracks. And then the exposure to chlorine and the water pressure drives those cracks from the inside to the outside. What you're seeing is the initiation of those little cracks that eventually, over time, latent defect causes leaks in the pipe and damages. This is not anything new. The science is not new on this. I tried this case against another manufacturer a number of times. Same defect, different manufacturer, but the same defect. Chlorine concentration caused the initiation of the cracks and then penetration by the water pressure caused the cracks to cause leaks. I tried it several times in the 1990s. So, it's not a new problem at all. Southwest Second is reputed with NRA polybutylene. Sixteen appeals, three to the Texas Supreme Court. This is not a new issue with regard to this manufacturer, if they've looked at the other manufacturers at all. It's a latent defect. Failures will occur in the future. And the damages are not insignificant. Picture water coming out of your light fixture or picture water coming out of your wall or your ceiling collapsing as a result of it. Picture going away for a period of time and coming back to see water coming out of your front door. It makes no difference who installs the pipe. It's been installed all over the United States by different plumbers, different contractors. And it makes no difference because the failures occur from the inside to the outside. And I'm not telling you anything that NIBCO didn't know when it sold the pipe. If you look at the appellate record, 32— But you have the problem that nobody's ever really happy with their settlement. I mean, the whole notion of a settlement is we're going to kind of find a middle ground. We're going to come to the middle. I want $100 million, and you want to offer me nothing. And then we end up at $10 million. That's a lot lower than I wanted but a lot higher than you wanted. That's how settlements go. So what can you point to that shows that we should not defer to the discretion of the district court in analyzing all of the ins and outs? Well, Your Honor, I've been accused of wanting the full loaf. I'm familiar with compromises, too. I understand what it takes to compromise a lawsuit. But it's not that difficult to analyze this. And I'm also against the concept of just taking a number and throwing a dart at it and saying this is the settlement number. I think you have to do an analysis of the settlement, and I think you have to do an analysis of the damages. And it's not very hard in this instance to do that because this is just a property damage case, pure and simple. And basically what you've got is you've got a replumb cost of about $12,000 to $13,000 per home. And so do the math. 8,100 homes by 12,000 to 13,000 is $100 million. Just do the math on it. And then you look at their defenses and statute of limitations. Take a look at page 26 of our reply brief. There's three or four cases that basically say that statute is denied. And the economic loss rule with regard to consequential damages doesn't apply. But the big thing that I would reduce this for would be the time and expense that it would take to get this done, to be able to try this case and get it to completion. And part of that would be basically the time it takes to go through the judicial process. So I would reduce it. Yes, I would, Your Honor. But I wouldn't reduce it to 7% or 8% from $100 million. I would reduce it mostly by half, by $50 million. But $7 million? How do you get to that? How do you get to 7% of a property damage case that if you don't consider punitive damages, and there is a punitive damage case here, if you don't consider consequential damages, and there is a consequential damage case here, if you don't consider any of that and you just say, okay, we're going to take cost of replumb, it comes out to $100 million, and then you reduce it to 7%, where does that come from? How did they determine the coal settlement was adequate? How was that determined? I'm sorry, Your Honor. The settlement in coal, the coal case? The coal case, yes. Yeah, it was an adequate settlement. First of all, the coal case isn't before the court, this court. But the coal case basically was a case that was decided based upon only one objector, and that objector, Mr. Palmer, was a frequent objector. He was a serial objector, and he objected to the case basically to try to get attorney's fees. I'm not here for that. I don't want their money. I'm not here for that at all. What I want is basically to see these people get some justice, and $7 million just doesn't cut it. Mr. Fleming, while there's still time, and I know we're taking it kind of out of order, and you began by talking about standing, so let me go back to that. The magistrate judge held that you did not have standing. Is that right? That's right. Okay. And in your opening brief, what we call the blue brief, you did not tell us how it is that he erred in that determination. So it seems to me that you forfeited that issue by failing to raise it in your initial brief. Your Honor, the standing issue was not at the final judgment, and there was no contest with regard to the standing issue at all. And so, since it's not in the final judgment, and the final judgment doesn't allude to Garcia's standing, Garcia went with it because there's no issue in the final judgment for this court to review. Let me go back to the issue and analysis of the settlement. The settlement itself has to have a rationale to it. You can't just throw a dart up against the wall and say, that's it. That's not the way people do settlements. I mean, I understand compromise. I got that. But what I don't understand is a number that can't be justified. You have to justify a settlement, and the plaintiff's bar does that all the time, and I've done that for over 50 years. And basically, what you're looking at here is you start with $100 million, and then you race to the bottom to get to the settlement at 8%. You have a case where there's no subclass for the future. There's no consideration for the future at all. There's no expanded relief for the future. There's no extension of the deadlines that occurred here, and there's no fund for future claims. And if you can't agree, Your Honor, with regard to what this compromise settlement is, there's a solution. You try the case. And this case can be tried, and it can be tried expeditiously. And I believe that we will put on a plaintiff's case, in this case, for a week and a half, two weeks. You don't call 8,100 clients. You call technical experts, and you call people who are skilled at resolving cases like this with regard to the damages issue. Thank you, Your Honor. All right. You save some time for a vote, Mr. Fleming. Thank you. Thank you. Mr. Lincoln? Good morning. Please support. My name is Robert Lincoln. I am counsel for Plaintiff Appellees David and Barbara Matson. I was appointed by the lower court as class counsel, along with my co-counsel. In the lower court, the magistrate issued a final settlement approval order, which contained detailed factual findings. Those detailed factual findings and the conclusions of law contained in the order were based upon a full record. In fact, the lower court conducted a full-day final approval settlement hearing at which the court was able to examine evidence submitted by the parties and by the appellant, Mr. Garcia. It included live witnesses, the cross-examination of live witnesses. Based upon that full record, the court conducted a rigorous analysis of the settlement, Rule 23A, and the three requirements in order for certification of the settlement class and reached a conclusion that the settlement should be finally approved. As the court knows, it reviews that order on an abuse of discretion standard, and the appellant is appointed to nothing in the record that demonstrates an abuse of discretion, certainly not clearly an abuse of discretion, by the lower court. Well, the argument is, hey, this is just too little money, all things considered, given what's going to cost, he thinks, to everyone. How do you respond to that? Well, my response to that is that is not a proper basis for an objection to a settlement. The court examined the settlement using the circuit's read factors and determined that based on all those factors and its detailed factual findings, not a brief review of the read factors, but supported by factual findings, facts presented in the record to the court, that the settlement was fair, reasonable, and adequate. The objection that a settlement fund isn't enough is never a proper objection. This court in Pettway made that clear. There are competing merits and interests that are reviewed by the court, and based on those competing merits and interests, the parties are free to reach a compromise that reflects the information regarding the merits before them. With regard to Garcia's first contention that the class representatives here were not adequate, as the court noted, Garcia forfeited that argument. The district court, or the magistrate, determined that Garcia did not have standing to raise the adequacy argument that he did because, like the class representatives, Garcia was also a so-called wet plaintiff or wet claimant, and therefore the change he sought to the settlement would not impact or improve his own position. And therefore, although certainly class members have the general right to object to a settlement, the specific objection they raise has to impact their own interests, and therefore the magistrate found that Garcia lacked standing. As the court noted in Garcia's opening brief, he didn't address that finding, which is an alternative and independent finding which this court can affirm the lower court's ruling on adequacy. But it doesn't affect the issue of the settlement itself, the settlement amount. And he still has that right to challenge, so that's still before us even if we end up agreeing with you on the forfeiture of the adequacy point. That's correct, and that was clear in our briefing. He certainly has a right to object to the court's evaluation of the brief actors, and he would have to point to some abuse of discretion by the lower court or the magistrate judge in reaching his conclusions, but he doesn't even do that. He really just presents this court with continued argument of fact. This court considered the fact. It looked at the competing testimony before it, the expert reports that were presented to it. In fact, the expert report, Mr. Cooney will speak to this, that NIPCO presented regarding the statistical analysis and the likelihood of future leaks was unrebutted in the lower court court. So the district court did its work, conducted a rigorous analysis, and properly reached the conclusion that the read factor supported approval of the settlement. But with regard to the issue of the adequacy of the class representatives, even if this court were to review that issue, which Garcia has forfeited, the class representatives were adequate. Amchem and Ortiz are not in control here. Amchem and Ortiz rose under very different circumstances, a very different procedural and legal and factual framework. Amchem and Ortiz dealt with claimants who had varying medical conditions arising out of the asbestos exposure. Some class members suffer from cancer, would suffer from catastrophic illness, while other class members would not. The differing illnesses, the differing damages placed some claimants in Amchem and Ortiz in fundamental conflict with other members of the class. On top of that were the procedural differences. Amchem and Ortiz were settlements that were filed on the same day as the complaints in those cases. They were prepackaged settlements. That wasn't the case here. The record is clear. We filed this case in 2019 with the expectation that we would litigate it to the end of the road. There was no prepackaged settlement. In Amchem and Ortiz, particularly in Ortiz, the defendants picked the plaintiff's counsel they wanted to negotiate with and settled with them in particular. That wasn't the case here. We were litigating this case. And Ortiz, in particular, was a mandatory B-1 settlement. There were no rights of opt-out. And both the courts in Amchem and Ortiz were particularly concerned by the difficulty of notice in those cases, which overarched all of those procedural issues because it was unclear whether notice was illusory or not. There were some potential claimants who hadn't even been born yet at the time that those settlements were reached. Let me ask you a standing question. I know you want to go on from that, but isn't every wet class member a potential dry class member because you might get leaks in the future? So why is that a standing problem? I'm not—so certainly dry class members could become wet class members, but once a wet class member, you are a wet class. Even though that was remedied, but there might be in the rest of the House later— Well, so certainly there could be continuing leaks. That is true. And that, in fact, was one of the reasons why the Dewey Court in the Third Circuit found that there was not a fundamental conflict between wet and dry or present and future claimants because there was always the risk of future leaks for the presently injured or the present claimants so that their representation of future claimants was adequate. They continued to run the same risk as— Well, Burke claims would have that potential risk. Right. That is—that's really what underpins Dewey. And it really gets to what this Court was speaking about in Deepwater Horizon, which is there is a significant difference between a fundamental conflict among claimants in a class and differently weighted interests. And here, at best, what you can say is that present claimants and future claimants have differently weighted interests, and they aren't particularly significant. But even if the Court were concerned by the differently weighted interests, the structure of the settlement itself protects and mitigates against those differently weighted interests by providing for the same level of reimbursement, no difference whatsoever between the present claimants and the future claimants. They all get a full— You said it wasn't the same. Well, that's belied by the record. The settlement is clear. It's a floor of 50% for leak damages, a ceiling of up to 75% for qualifying claimants, a re-plumb at the same rate of reimbursement. That is absolutely part of the settlement. And as the Court also noted, the settlement does nothing to take away the warranty claims of class members. There's an ADR procedure— Your opponent says the warranty is worth nothing in this situation because it's only manufacturing defect, not design defect. Well, first of all, that's a determination for the special master and then upon review by the magistrate as to whether or not those claims are made on an individual basis if a warranty claim is made by a claimant. But we certainly brought warranty claims in our complaint. In fact, Garcia's counsel had a competing class action filed in the same district, filed long after ours, in which he brought warranty claims and argued to the district court that those warranty claims were valid. So it strikes me as somewhat incongruent that he would claim that there's no value to the warranty. And back to the standing. Assuming arguendo that it wasn't forfeited, doesn't Rule 23E5A allow any class member to object? Well, I would say that as a general principle, class members have a right to object to settlements, and that is an unabridged right. But it is cabin to the extent that to have standing to bring a particular objection, you must seek a change to the settlement that will impact you as the objector. That's the law in the Sixth Circuit, the Eighth Circuit, the Ninth Circuit, and certainly here in the Fifth Circuit, which this court recognized in the Inouye Chicken Antitrust litigation opinion. All right. Thank you, Mr. Lincoln. Thank you. Cooney? May it please the court. My name is Gordon Cooney, and I represent NIPCO. I want to make three overarching points. First, with respect to standing, Garcia has standing to assert certain objections to the settlement as to the fairness, reasonableness, and adequacy, but does not have standing to object with respect to the rights of those who have yet to experience a bleak since he allegedly experienced multiple leaks. He is not adversely affected by that aspect of the settlement. The Devlin case stands for that proposition. The Chicken Antitrust case stands for that proposition. And so, number one, he doesn't have standing. Number two, he did not address in his opening brief before this court the district court's conclusion, the independent conclusion that he lacked standing. The only thing the opening brief— But he says that wasn't included in the judgment. Your Honor, I don't think that's a requirement. The judgment doesn't need to articulate all of the grounds that are interlocutory and that led to the final judgment. Frankly, a final judgment rarely describes all of the issues. Actually, I guess under Rule 58, it's not supposed to. It's not supposed to, Your Honor. That's exactly right. And so the fact is, number one, he doesn't have standing under Devlin and Chicken. And number two, he forfeited by not raising the independent ground in his opening brief. And number three, he's wrong as a matter of law, as Mr. Lincoln has said. There is no conflict in this case. This court's opinion in Deepwater is instructive in that regard. Second thing, I want to talk about this issue about the warranty, the express warranty. These homes, members of the court, were built between 10 and 14 years ago. They have another three years under the settlement to assert claims. We introduced unrebutted expert statistical testimony showing that based on the date of installation to failure, these leaks are projected to expire by the 2025 deadline. But with regard to the limited warranty, the only way these class members would get around time bar issues is by invoking that express warranty. And so if they have a claim to bring, it would be under the express warranty, and they've been preserved under Section 17 or Section 18 of the settlement agreement. Finally, although Mr. Garcia says that there is no manufacturing defect in the case, and although we believe the claims are claims for design defect and therefore foreclosed by the case law regarding workmanship and materials warranties, Mr. Garcia's own expert, Ms. Smith, in the approval hearing, characterized the defect as including manufacturing defects. So this settlement preserves potential claims that class members may have to assert that they have a manufacturing defect as long as they can meet all of the other requirements to establish a breach of warranty claim. And then the final point I simply want to make is that the lower court's opinion included a very careful and thorough analysis. This was not a rubber stamping of the settlement by any stretch of the imagination. The court made multiple findings after a live hearing considering significant evidence, and Garcia's argument on appeal ignores the findings. The argument on appeal pretends that there were no findings made below, and the same arguments that were advanced below in many respects are being advanced here without any attempt to address the very specific findings the district court made and try to make any argument as to why the district court erred with respect to those findings. The argument ignores that a settlement is a compromise. It ignores that the lower court specifically found that NIPCO had raised, quote, substantial meritorious defenses. That's the court's opinion at 21-22. He doesn't discuss any of the case law as to why there are legally dispositive defenses on the merits and with respect to damages, and instead he relies on opinions decided at the motion to dismiss level, including opinions that specifically say these issues can be re-raised on summary judgment or at trial. He says it doesn't matter who installed the products, but all you have to do is look at the record. NIPCO's experts disagree that what we have here is an installer issue, and if you compare the incidence of leaks in these particular developments, which were plumbed by a small number of plumbers, and compare that with what happened nationally, the leak rate is substantially different in these communities than what you have nationally. That strongly suggests that what we have here is something unique to the installation that was done. It certainly would have given NIPCO strong arguments for a settlement that in comparative terms was substantially smaller than the coal settlement, but what we did here, Your Honor, was to have a substantially greater settlement on a per capita basis than you saw in the coal case, even though we had strong arguments that what we were seeing here in these communities was aberrational to what happened in the rest of the country and the result of installer error. But the bottom line is the court carefully considered this evidence, properly considered NIPCO's strong arguments on the merits both legally and factually, and factored that in properly under the Reid analysis. And then finally, the argument that this settlement is just too small, that is not an argument that the district court or the trial court in this case abused its discretion. To the contrary, what the court did in this case was to conduct a very careful, very thoughtful analysis. There is no abuse of discretion, and appellant has not established abuse of discretion. We respectfully urge that the court affirm this settlement. We have one objector who is standing in the way of these homeowners getting a very significant remedy. They should get that remedy. The settlement should be—the judgment below should be affirmed. The court did not err. Thank you, Your Honor. All right. Thank you, Mr. Cooney. Mr. Fleming for rebuttal. Ms. Smith testified without any objection and without any rebuttal that she's seen this product fail from Maine to Mexico. It's failed all over. It's failed with every installer and every plumber. It has to do with failing from the inside out, not the installation. And that testimony was not rebutted. She testified that all of them need to be replaced, that there's no way to predict when they'll fail. And if you just look at the class reps, the Matson claimants, they've signed a leak in 2010 and then again in 2015. The Garrett couple, they signed a leak in 2017 and then eight leaks since 2019. These are continuing leaks. They continue to go on. There's future claimants that are not represented in this class under Amkin. There's no subclass reps at all, period, with regard to this class. There's no fund for future losses. There is a cutoff date here. The cutoff date in this settlement is May 2025, barely three years from now. And basically what that does is that stops this idea that you can continue on is nonsense under this settlement. This settlement basically has a cutoff date for claims. And if you're not at your third qualifying leak, then you're cut off under this settlement. Let me ask you, were the pipes that failed, were the replacement pipes different? I'm sorry, what? The pipes that failed and were replaced, were the replacement pipes the same as the ones that failed or a different type? A different manufacturer. They have to replace it with a different set of pipes that won't fail. But my point basically, Your Honor, is— It's a different set, but is it a different manufacturer? It's a design defect. The stabilizer inside the pipe is such that it won't take the chlorine that's in the pipe. I understand. You explained that. When they replaced the pipes that failed, did they use the same pipes, the same kind of pipes, or a different manufacturer's pipe? Different. Okay. With regard to the warranty, you know, why have a class if you've got the warranty protection? This is a warranty that only protects against manufacturing defect in a case that is a design defense case. With regard to standing, Rule 23E5A is pretty plain. Any class member may object to the settlement proposal. Yeah, but you should have said that in your blue brief. The reality is, a lot of things happen in a case that are not in the final judgment that are appealable. For example, discovery fights can certainly be appealed after a final judgment, and they're rarely mentioned in the final judgment. So the notion that you couldn't have appealed that is just beyond me. So it should have been in the blue brief. Can you explain why it was not? Well, Your Honor, I'm citing to this court's opinion in U.S. v. Fletcher with regard to the importance of the final judgment with regard to the appeal. Here, the final judgment doesn't allude to the lack of standing. And finally— What do you do about Rule 58? I don't understand. Rule 58 is very strict, and our case law is very strict, that the final judgment is only to declare the result. It's not to include any kind of explanation or reasoning. And that, of course, is to put everyone on notice that it is a final judgment and it's appealable. All right. I understand, Your Honor. But what I guess I'm pointing out to you is that the final judgment here does not incorporate anything with regard to standing with regard to Garcia. We don't believe we weighed anything with regard to Garcia's standing in this case. And that is our position. And finally, the Cole case. The Cole case is—Ditko admits at page 6 of their brief that they only had claims of 1 to 3 percent in the Cole case. And the only objection they had was the serial objector, Palmer. And we're not here as a serial objector. We're here—we're not here after getting attorney's fees. We believe we have a serious objection. We ask the court to send this case back reversed. Thank you. Thank you, Mr. Fleming. Your case is under submission.